UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FIRST PRESBYTERIAN CHURCH OF
YPSILANTI,

       Plaintiff,

v.
                                  Case No. 07-13132

H.A. HOWELL PIPE ORGANS, INC.,         Honorable Patrick J. Duggan
TIMOTHY E. BOLES, CURT SCHMIDT,
and R. KARSTENS ORGANWORKS,
LTD.,

       Defendants.

_____/

**OPINION AND ORDER**

At a session of said Court, held in the U.S.
District Courthouse, City of Detroit, County of
Wayne, State of Michigan, on _____.

PRESENT:        THE HONORABLE PATRICK J. DUGGAN
                   U.S. DISTRICT COURT JUDGE

     Plaintiff First Presbyterian Church of Ypsilanti ("FPCY") filed this suit against

Defendants H.A. Howell Pipe Organs, Inc. ("Howell"), Timothy Boles ("Boles"), Curt

Schmitt ("Schmitt"),[1] and R. Karstens OrganWorks, LTD. ("RKO") alleging various claims

of fraud, breach of contract, and unjust enrichment.  Presently before the Court are three

motions for summary judgment: one filed by Howell and Boles, the second filed by Schmitt,

_____

[1]As listed in the caption, the case was originally filed against Curt "Schmidt."
Since FPCY served him, however, the parties have been referring to him as "Schmitt."
The Court will therefore adopt this spelling as well for purposes of this Opinion and
Order.

and the third filed by RKO.  The motions have been fully briefed and the Court held a hearing on January 21, 2010.

## I. Facts and Procedural Background

The present action arises out of the failed contractual arrangement between FPCY and Howell regarding the construction and installation of a new pipe organ at FPCY's church. The basic allegations underlying the suit are that Boles and Schmitt, purportedly working as agents for Howell, induced FPCY to enter into a contract and pay large sums of money for a pipe organ that Howell never produced.  When FPCY finally discovered that no organ would be forthcoming, FPCY alleges that Boles arranged for RKO to take over Howell's business in an attempt to prevent FPCY from recovering monetary damages.

The dispute between the parties has been developing since late 2000 when FPCY first sought bids for a pipe organ to replace the one currently in use at the church.  Boles, the president and owner of Howell, received the bid request but felt he did not have time to respond personally.  Consequently, Boles called on Schmitt, the former owner of Howell, for assistance.  Schmitt then responded to FPCY on behalf of Howell and Boles.  Schmitt informed FPCY that he was a former owner of the company, that business had been good for Howell, and that he had come out of retirement to help because Boles was too busy.

After nine months of discussion between Boles and Schmitt and FPCY's representatives, Howell and FPCY entered into an agreement on August 22, 2001, that called for the construction of a specified organ at an agreed price by no later than March 2005. Pursuant to that agreement, FPCY made an initial payment in August 2001 of $94,672

2

intended to cover the costs of imported pipes, preliminary work, and engineering. After that, FPCY agreed to make periodic payments based on a "Tentative Schedule of Payments and Work" attached to the contract. Howell was to provide periodic invoices noting the time and materials charged toward the completion of work on the organ. Pursuant to such invoices, FPCY made several periodic payments between April 2002 and August 2004 totaling $184,606 and bringing the contract total to $279,278.

As previously indicated, the organ was not ready by March 2005 as required by the agreement. Howell, through Boles and Schmitt, made repeated representations up to October 2006 that performance would be forthcoming. During that time, however, it became increasingly apparent that Howell had not been using FPCY's payments to purchase materials for or to construct the specified organ. In fact, FPCY discovered that Howell had been experiencing business and financial difficulties even before signing the FPCY contract. It appeared that Howell had been using FPCY payments to fund other projects on which it was behind. When Howell signed the FPCY contract in 2001, it was behind on all of its pending projects. Not receiving satisfactory answers to its inquiries, FPCY ultimately cancelled the contract in January 2007 and obtained an organ from another company.

On July 26, 2007, FPCY filed its original complaint asserting claims against Howell, Boles, and Schmitt. Around the same time, a former Howell employee, Randy Karstens ("Karstens"), purchased Howell's tools, equipment, and inventory and incorporated RKO. Howell then ceased doing business in September 2007. After nearly a year of minimal progress on the case, FPCY retained substitute counsel who filed a motion for leave to amend

3

on October 1, 2008. The Court granted Plaintiff's motion on November 18, 2008. FPCY's

amended complaint added RKO as a defendant and asserts six counts:

(I)  pre-agreement fraud in the inducement, silent fraud, fraudulent misrepresentation, and fraudulent concealment against Boles and Schmitt;

(II)  post-agreement silent fraud, fraudulent misrepresentation, and fraudulent concealment against Boles and Schmitt;

(III)  fraud and fraudulent concealment against Howell and RKO based on respondeat superior and successor liability;

(IV) breach of contract against Howell and RKO;

(V)  personal liability claims against Boles and Schmitt based on an alter ego theory of liability for Howell's alleged fraud and breach of contract; and

(VI) unjust enrichment against Boles and Schmitt.

In the three motions for summary judgment presently before the Court, defendants seek

dismissal of all claims except for the breach of contract claim against Howell.

## II. Standard of Review

Summary judgment is appropriate only when there is no genuine issue as to any

material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R.

Civ. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement

to require submission to a jury or whether it is so one-sided that one party must prevail as a

matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505,

2512 (1986). After adequate time for discovery and upon motion, Rule 56(c) mandates

summary judgment against a party who fails to establish the existence of an element essential

4

to that party's case and on which that party bears the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

The movant has an initial burden of showing "the absence of a genuine issue of material fact." *Id.* at 323. Once the movant meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986). To demonstrate a genuine issue, the non-movant must present sufficient evidence upon which a jury could reasonably find for the non-movant; a "scintilla of evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252, 106 S. Ct. at 2512.

The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See id.* at 255. The inquiry is whether the evidence presented is such that a jury applying the relevant evidentiary standard could "reasonably find for either the plaintiff or the defendant." *See id.*

## III. Count I: Pre-Contract Fraud

In the first count of its amended complaint, FPCY alleges that Boles and Schmitt engaged in fraudulent behavior to induce FPCY to enter into the underlying contractual agreement. As has been clarified in the briefing of the present motions, FPCY specifically alleges that Boles and Schmitt engaged in "silent fraud" by failing to disclose Howell's business and financial condition. FPCY also alleges that Boles and Schmitt made affirmative misrepresentations regarding the use of payments under the contract. Boles and Schmitt deny violating any affirmative duty to disclose Howell's business information and argue that

5

count I is otherwise barred by the future promise rule, the economic loss doctrine, the contract's merger clause, and the statute of limitations.

## A. Silent Fraud

FPCY's primary allegation in count I is that Boles and Schmitt violated affirmative duties to disclose material facts regarding Howell's business condition before execution of the contract between Howell and FPCY.  Under Michigan law, "silence cannot constitute actionable fraud *unless* it occurred under circumstances where there was a legal duty of disclosure."  *M&D, Inc. v. W.B. McConkey*, 231 Mich. App. 22, 29, 585 N.W.2d 33, 37 (1998).

Historically, silent fraud claims have been "based upon statements by the vendor that were made in response to a specific inquiry by the purchaser, which statements were in some way incomplete or misleading."  *Id.* at 31, 585 N.W.2d at 39.  As a general rule, then, "in order to prove a claim of silent fraud, a plaintiff must show that some type of representation that was false or misleading was made and that there was a legal or equitable duty of disclosure."  *Id.* at 32, 585 N.W.2d at 39.  As to the latter requirement, an equitable duty of disclosure generally arises only upon an expression of concern or direct inquiry by a purchaser regarding the particular issue in question.  *Id.* at 33, 585 N.W.2d at 40.  Nonetheless, it remains possible that "highly misleading actions" could support a claim for silent fraud absent specific inquiry.  *Id.* at 33-34, 585 N.W.2d at 40.

In this case, FPCY argues that the affirmative duty of disclosure arose upon a statement by Schmitt that business for Howell had been "very good."  FPCY asserts that this statement

6

gave the misleading impression that Howell was operating its business in a timely, profitable, and reputable manner.  There is no allegation that FPCY specifically inquired into Howell's financial condition or Howell's past or pending performance on other contracts. Nonetheless, FPCY maintains that Boles and Schmitt were required to supplement the incomplete and misleading statement with disclosures regarding Howell's cash-flow difficulties as evidenced by loans made by Boles and Schmitt to Howell, Howell's practice of using customer payments to fund work on other contracts, and Howell's history of tardiness on other projects.[2]  Plaintiff's counsel conceded at the motion hearing that such details would not need to be disclosed under normal circumstances but argued that FPCY's commitment to make payments toward the organ before receiving the finished product gave rise to the duty of disclosure.

FPCY's argument stretches the concept of silent fraud too far.  A statement that business has been "very good" is ambiguous and subject to multiple interpretations. Nonetheless, FPCY failed to seek specific clarification and drew unwarranted inferences

---

[2]FPCY also takes issue with alleged representations by Schmitt regarding Howell's pending projects and the fact that  Howell was "approximately 40 months out" on work at the time of the FPCY contract negotiations.  The Court remains unsure whether FPCY alleges that these representations were actually fraudulent or were incomplete and misleading representations giving rise to a duty of disclosure.  In either case, the Court concludes that the alleged representations fail to give rise to an actionable fraud claim.  Although Howell was behind on many, if not all, of its pending projects, it does not appear that Howell was much more than 40 months out on any of the projects at the time of the FPCY contract negotiations.  (FPCY's Resp. to Schmitt's Mot. for Summ. J. at 13-14.)  Furthermore, FPCY made no specific inquiries into Howell's pending projects that would have given rise to a duty of disclosure.

7

from what is primarily a statement of opinion. Such circumstances do not give rise to an affirmative duty of disclosure. *See Hord v. Envtl. Research Inst. of Mich.*, 463 Mich. 399, 413, 617 N.W.2d 543, 550-51 (2000) (concluding that disclosure of past financial information does not require disclosure of updated financial information absent specific inquiry and that unwarranted conclusions drawn from anecdotal references do not give rise to liability for silent fraud); *Van Tassel v. McDonald Corp.*, 159 Mich. App. 745, 750, 407 N.W.2d 6, 8 (1987) ("An action for fraud may not be predicated upon the expression of an opinion or salesmen's talk in promoting a sale, referred to as puffing."). Therefore, to the extent count I is premised on an alleged affirmative duty to disclose Howell's financial and business condition, Boles and Schmitt are entitled to summary judgment.

## B. Misrepresentations Regarding the Use of Contract Payments

FPCY's count I is also premised on alleged misrepresentations regarding Howell's use of contractual payments. During contract negotiations, Howell explained to FPCY that a higher initial payment would "pay for imported pipes in full at signing" while a lower payment would only cover a down payment with no guarantee regarding future variations in exchange rates.[3] (FPCY's Resp. to Schmitt's Mot. for Summ. J. Ex. 15-L.) Similarly, Howell impliedly represented that periodic payments made on the contract would correspond with the completion of work on the organ by presenting FPCY with a "Tentative Schedule

---

[3]FPCY is unsure whether written representations on behalf of Howell came from Boles or Schmitt. While the source of the representations would be important for purposes of assigning personal liability, the Court need not resolve that issue in this case.

of Payments and Work."  Furthermore, the contract included language that the periodic invoices would note "time and materials charged toward the completion of the work specified" and would be "itemized in a manner which will allow Purchaser's Representative to document receipt of materials." (*Id.* Ex. 14 at 3, Appendix B.)  FPCY alleges that, even before the contract was signed, Boles and Schmitt knew payments would not be applied toward completion of FPCY's organ, but that they made the representations to induce FPCY to enter into the contract.

As noted above, Boles and Schmitt oppose this claim on a number of grounds including that the claim is barred by the future promise rule.  This rule requires that "fraudulent misrepresentation . . . be predicated upon a statement relating to a past or an existing fact [because] [f]uture promises are contractual and do not constitute fraud." *Hi-Way Motor Co. v. International Harvester Co.*, 398 Mich. 330, 336, 247 N.W.2d 813, 816 (1976).  As an exception to this rule, though, future promises may be actionable as fraud where they are "made in bad faith without intention of performance." *Id.* at 338, 247 N.W.2d at 816.  Where there is no proof of the promisor's intent, "the facts of the case [may] compel the inference that the promise was but a devise [sic] to perpetrate a fraud." *Id.* at 339, 247 N.W.2d at 817.

At times, FPCY's arguments seem to imply that Howell's pre-contractual business and financial condition evidenced an intent not to use FPCY's payments as described; FPCY also states, however, that it "does not claim that Howell misrepresented its ability or future performance." (FPCY's Resp. to Boles's and Howell's Mot. for Summ. J. at 5.)  Having reviewed the record, the Court concludes that there is insufficient evidence to justify

9

application of the bad faith exception to the future promise rule.  There is no direct evidence of intent by Boles or Schmitt that Howell not perform future promises.  And although record evidence establishes that Howell was running behind schedule on a number of projects, it appears that the company was trying to catch up and meet its obligations.  The Court can find no support for the argument that the bad faith exception was meant to extend to companies such as Howell whose business struggles create a risk, not a guarantee, of nonperformance. *See Marrero v. McDonnell Douglas Capital Corp.*, 200 Mich. App. 438, 444, 505 N.W.2d 275, 279 (1993) ("A mere broken promise does not constitute fraud, nor is it evidence of fraud."); *cf. Colby v. Zimmerman*, No. 220395, 2001 WL 1219414, at *2 (Mich. Ct. App. Oct. 12, 2001) (acknowledging the relevance of the bad faith exception where there was evidence that a landowner previously sold property that he later promised to lease to another).  Therefore, the remainder of FPCY's count I is barred by the future promises rule and Boles and Schmitt are entitled to summary judgment on that claim.

## IV. Count II: Post-Contract Fraud

In count II, FPCY alleges that Boles and Schmitt engaged in post-contract fraud by continuing to remain silent as to Howell's business and financial condition and making additional misrepresentations to induce FPCY to make periodic payments on the contract. Because the Court previously determined that Boles and Schmitt were under no affirmative duty to disclose, that portion of FPCY's count II is likewise subject to dismissal.  As to the misrepresentations inducing payment, Boles and Schmitt again assert that the claim is barred

by the future promise rule, the economic loss doctrine, the contract's merger clause, and the statute of limitations.

Before addressing the merits of FPCY's claim, the Court pauses to consider Schmitt's involvement in count II. Having dismissed the silent fraud allegations, FPCY's post-contract fraud claim relies on alleged misrepresentations regarding Howell's progress on the organ intended to induce periodic payments by FPCY. Those alleged misrepresentations came from Boles in his capacity as Howell's president. Because there is no evidence of post-contract misrepresentations by Schmitt, Schmitt is entitled to summary judgment as to count II.

As to the arguments raised by Boles in opposition to count II, several clearly lack merit. First, the future promise rule does not apply to FPCY's allegations of post-contract fraud because the claim is that Boles misrepresented the amount of work completed by Howell, not that he misrepresented Howell's intent to complete work in the future. Second, the contract's merger clause only restricts FPCY's ability to rely on statements made before or contemporaneous with the signing of the agreement; it has no bearing on allegedly fraudulent conduct after that point in time. Finally, count II is not barred by the statute of limitations. Because count II alleges post-contract fraud, the conduct giving rise to the claim necessarily occurred after August 22, 2001—the day the contract was signed. FPCY filed the present lawsuit, alleging post-contract fraud, on July 26, 2007—less than six years after the alleged misconduct. *See* Mich. Comp. Laws Ann. § 600.5813 (setting the statute of limitations at six years). Therefore, Boles is not entitled to summary judgment on any of these grounds.

11

This leaves Boles argument regarding the economic loss doctrine.  The economic loss doctrine generally prohibits plaintiffs from recovering under tort theory for claims that sound in contract.  *See Scarff Bros., Inc. v. Bischer Farms, Inc.*, 546 F. Supp. 2d 473, 487 (E.D. Mich. 2008).  In one common application, the economic loss doctrine bars fraud claims based on misrepresentations regarding the quality or character of goods purchased for commercial purposes.  *Huron Tool & Engineering Co. v. Precision Consulting Services, Inc.*, 209 Mich. App. 365, 373, 532 N.W.2d 541, 545 (1995).  But while fraud claims sound in tort, the economic loss doctrine does not bar all fraud claims.

The economic loss doctrine does not bar fraud claims based on fraud in the inducement or fraud extraneous to the contract.  *See id.*  Therefore, a fraud action lies where a defendant fraudulently induces a plaintiff to enter into the original agreement or to enter into additional undertakings.  *See id.* (quoting *Public Service Enterprise Group, Inc. v. Philadelphia Elec. Co.*, 722 F. Supp. 184, 201 (D.N.J. 1989)).  Alleging post-contract fraud, FPCY's count II does not include claims of fraudulent inducement to the contract as a whole.[4]  Rather, count II asserts that Boles fraudulently induced FPCY to make periodic payments on the contract by representing that Howell was completing work on the project. At this stage of the litigation, the Court is satisfied that FPCY has created a genuine issue of fact as to whether FPCY was obligated to make payments only upon the completion of work by Howell and whether Boles made affirmative, fraudulent misrepresentations as to the work completed by

---

[4]FPCY's fraudulent inducement claims were analyzed in the Court's discussion of count I.

Howell in order to induce periodic payments. Therefore, Boles's motion for summary judgment as to count II is denied.

## V. Count III: Fraud Claims against Howell and RKO Based on Theories of Respondeat Superior and Successor Liability

In count III, FPCY attempts to hold Howell and RKO liable for the fraudulent conduct alleged in counts I and II based on theories of respondeat superior and successor liability. To the extent that Boles may have engaged in post-contract fraud, Howell may also be held liable for that conduct through the doctrine of respondeat superior. Howell presents no arguments to the contrary, other than to argue that Boles did not commit fraud in the first place. Because the Court already rejected that argument for purposes of the present motions, Howell's motion for summary judgment is denied as to count III.

Rather than challenge the fraudulent nature of Boles's conduct, RKO seeks summary judgment on count III on grounds that it is not subject to liability as a successor of Howell. FPCY maintains, however, that the circumstances surrounding RKO's purchase of Howell's assets renders RKO liable as a successor under several exceptions to the general rule of no liability.

The general rule of successor liability is well established in Michigan law:

> (I)f one corporation purchases the assets of another and pays a fair consideration therefor, no liability for the debts of the selling corporation exists in the absence of fraud or agreement to assume the debts . . . .
>      There are certain instances, however, in which the purchaser or transferee may become liable for the obligations of the transferor corporation. The transferee may be held liable for the debts of the transferor corporation: (1) where there is an express or implied assumption of liability; (2) where the transaction amounts to a consolidation or

13

> merger; (3) where the transaction was fraudulent; (4) where some of the elements of a purchase in good faith were lacking, or where the transfer was without consideration and the creditors of the transferor were not provided for; or (5) where the transferee corporation was a mere continuation or reincarnation of the old corporation.

*Turner v. Bituminous Casualty Co.*, 397 Mich. 406, 417 n.3, 244 N.W.2d 873, 878 n.3 (1976) (quotations omitted).  FPCY argues that RKO can be held liable for Boles's alleged fraud under the last three exceptions or any combination thereof.

Although listed separately, the last three exceptions to the general rule of no liability for successors tend to overlap in application.  To determine if a transferee corporation is a mere continuation or reincarnation of the transferor, courts typically consider whether the transferee "continues to use the seller's name, location, and employees, and [if] there exists a common identity of stockholders and directors."  19 Am. Jur. 2d Corps. § 2326; *see also Turner*, 397 Mich. at 430, 244 N.W.2d at 883-84.[5]  Under this analysis, "[a] mere change of

---

[5]*Turner* specifically considered the doctrine of successor liability in the context of a products liability claim that did not arise until after the transfer of corporate assets to the successor corporation.  397 Mich. 406, 244 N.W.2d 873.  Ultimately, the Michigan Supreme Court concluded that public policy interests favor the expansion of successor liability in such cases.  *Id.* at 419-29, 244 N.W.2d at 878-83.  Therefore, the *Turner* court expanded the second exception to successor liability—where the transaction amounts to a consolidation or merger—to include cash transactions in addition to stock transactions. *Id.*  The court then explained that a cash transaction could amount to a consolidation or merger if certain elements of continuity exist between the transferee and transferor corporations.  *Id.*  It remains unclear to this Court whether the analysis set forth in *Turner* for products liability cases is intended to be any different than the analysis under the continuation exception applicable to all cases.  *See id.* at 417 n.3, 244 N.W.2d at 878 n.3 (listing the continuation exception as part of the "general rule" regarding successor liability).  In any event, the Court does not read *Turner* or its progeny to mean that the continuation exception is applicable only to products liability, and not commercial cases. *But see DeWitt v. Sealtex Co., Inc.*, Nos. 273387, 273390, 274255, 275931, 2008 WL

14

corporate name will not enable the company to avoid liability" and "[a]bsolutely identical ownership between the two corporations . . . need not be present . . . ." 19 Am. Jur. 2d Corps. § 2326. In any case, though, "there must be insufficient consideration running from the new company to the old" before the mere continuation exception can apply. *Id.* This last requirement makes the continuation exception similar to the other exceptions invoked by FPCY.

The fraudulent transaction and lack of good faith exceptions allow successor liability to attach where transfers between new and old companies leave the old company's creditors with nothing to collect. Specifically, the fraudulent transaction exception may apply "[w]here there is a shifting of assets of a debtor to a corporation whereby the only assets from which the creditors could expect to be paid are placed beyond the reach of their process." *Id.* § 2322. Similarly, a transfer may be said to be lacking in good faith if "one corporation takes over all the assets of another corporation and pays no consideration . . . , or the consideration is so inadequate that the creditors of the transferor corporation are unprovided for." *Id.* § 2327.

In the present case, FPCY has presented sufficient evidence to establish genuine issue of material fact as to whether the transfers between Howell and RKO were either fraudulent or lacking in good faith and whether RKO is operating as a mere continuation of Howell. As an initial matter, Boles admitted during his deposition that his decision to close Howell

_____

2312668, at *4 (Mich. Ct. App. June 5, 2008).

15

was prompted by the FPCY lawsuit.  (FPCY's Resp. to RKO's Mot. for Summ. J. Ex. 5 at 149-50.)  After FPCY began making demands and threatening to file a lawsuit for money damages, Howell began transferring assets to Karstens, a former employee of Howell who would later become owner of RKO.  On July 20, 2007, Howell sold its tools and equipment to Karstens for $8,000.  (*Id.* Ex. 15.)  Karstens did not take possession of the items but allowed Howell to continue using them as if no sale had taken place.  (FPCY's Supp. Resp. to RKO's Mot. for Summ. J. Ex. B at 14.)  Also in July 2007, Karstens purchased Howell's inventory of organ pipes for $3,000.  (*Id.* Ex. B at 74-75.)

Then in August 2007, Karstens incorporated RKO and took on Boles as a part-time employee.  (FPCY's Supp. Resp. to RKO's Mot. for Summ. J. Ex. 16; RKO's Mot. for Summ. J. at 5.)  When Howell ceased operating in September 2007, RKO began leasing the building that had been used by Howell so that none of the purchased equipment would have to be relocated.  (FPCY's Resp. to RKO's Mot. for Summ. J. Ex. 18.)  Howell previously owned the building but sold it to Schmitt sometime in 2006 or 2007 for cash-flow purposes.  (*Id.* Ex. 5 at 150, Exs. 11, 14.)  RKO also hired four out of five of Howell's employees.  (*Id.* Ex. 17 at 22, Ex. 19.)  Although RKO generally executed new contracts with Howell's former customers, Boles and Schmitt continued functioning in the same capacity under RKO as they had for Howell, the new contracts generally required RKO to complete the work previously promised by Howell, and the projects continued in the same manner as they had before the transfer using the works in progress that had been created by Howell.  (*See*

FPCY's Supp. Resp. to RKO's Mot. for Summ. J. Ex. B at 34, 55-56, 120, 122-24.)  Under these circumstances, it is not surprising that many of Howell's former customers believed that Karstens had "bought out" Howell and was simply operating the company under a new name.  (*Id.* Ex. A at 71-72, Ex. N.)

Ultimately, the transactions between Howell and RKO placed Howell's assets beyond the reach of FPCY and involved such inadequate consideration so as to leave FPCY unprovided for as a creditor.  Under these circumstances, there is at least a genuine issue of material fact as to whether RKO may be held liable as a successor corporation to Howell. Therefore, RKO's motion for summary judgment is denied as to count III.

## VI.  Count IV: Breach of Contract

In count IV, FPCY presents a breach of contract claim against Howell and RKO. Howell is not seeking summary judgment on this claim.  RKO opposes the claim on grounds that it is not liable as a successor corporation.  For the reasons discussed above, RKO's motion for summary judgment is also denied as to count IV.

## VII. Count V: Alter Ego Liability for Howell's Fraud and Breach of Contract

In count V, FPCY seeks to hold Boles and Schmitt personally liable for the fraud and breach of contract alleged against Howell in counts III and IV.  To justify imposition of personal liability, FPCY argues that Boles and Schmitt acted as alter egos of Howell. Opposing this claim, Boles argues that FPCY failed to present sufficient evidence to support the elements of alter ego liability.  Meanwhile, Schmitt argues that he cannot be held liable

as an alter ego because he is neither an owner nor a shareholder of Howell and is not a signatory to the contract.

Under Michigan law, the general rule is that "separate corporate identities will be respected, and thus corporate veils will be pierced only to prevent fraud or injustice." *Wodogaza v. H & R Terminals, Inc.*, 161 Mich. App. 746, 756, 411 N.W.2d 848, 852 (1987). To succeed in an alter ego claim and pierce the corporate veil, a plaintiff must establish three elements: "First, the corporate entity must be a mere instrumentality of another entity or individual.  Second, the corporate entity must be used to commit a fraud or wrong.  Third, there must have been an unjust loss or injury to the plaintiff." *Nogueras v. Maisel & Assocs. of Mich.*, 142 Mich. App. 71, 86, 369 N.W.2d 492, 498 (1985).  Factors considered to determine whether a corporate entity is used as a mere instrumentality include "undercapitalization of the corporation, the maintenance of separate books, the separation of corporate and individual finances, the use of the corporation to support fraud or illegality, the honoring of corporate formalities, and whether the corporation is merely a sham." *Laborers' Pension Trust Fund v. Sidney Weinberger Homes, Inc.*, 872 F.2d 702, 704-05 (1988).  Ultimately, though, "[e]ach case involving disregard of the corporate entity rests on its own special facts."  *Kline v. Kline*, 104 Mich. App. 700, 703, 305 N.W.2d 297, 299 (1981).

Having reviewed the record evidence, the Court concludes that FPCY failed to adequately support its alter ego claims.  Although Howell was struggling to meet its obligations to FPCY and other customers during the relevant time period, there is no

18

indication that the corporation was a mere sham.  Indeed, both Boles and Schmitt tried to keep the corporation afloat by making personal loans to Howell.[6]  That those efforts ultimately failed and resulted in a breach of the FPCY contract does not mean that Boles or Schmitt used the company as a mere instrumentality.[7]  Therefore Boles and Schmitt are entitled to summary judgment on count V.

## VIII. Count VI: Unjust Enrichment

In its fifth count, FPCY seeks recovery of its contract payments from Boles and Schmitt on a theory of unjust enrichment.  FPCY asserts that Boles and Schmitt induced payments from FPCY so that Howell could repay loans made by them.  Boles and Schmitt argue that the claim is barred by the existence of an express contract between FPCY and Howell, the fact that FPCY conferred no benefits on them, and by the running of the statute of limitations.

---

[6]This is not an indication that Boles and Schmitt failed to keep corporate and individual finances separate.  These financial transactions were apparently accounted for in the books because FPCY presents evidence regarding amounts of loans and repayments.  In other words, there was no free flowing, unaccounted for exchange of funds between Howell, Boles, and Schmitt.  Furthermore, the actual concern in the alter ego context is that the individual will take from the corporate coffers for personal use without accounting to the company, not that the individual will lend personal money in an attempt to support the corporation.

[7]It is difficult to imagine that Schmitt could ever use Howell as an instrumentality given that he is not an owner, shareholder, or officer of the company.  Although Schmitt acted as an agent for Howell in negotiating the FPCY contract, there is no evidence that Schmitt had any authority or ability to control the manner in which Howell maintained its books or abided by corporate formalities, among other things.

As a general rule, "[a] claim of unjust enrichment does not apply if there is an express contract . . . ." *Able Demolition v. Pontiac*, 275 Mich. App. 577, 586 n.4, 739 N.W.2d 696, 702 n.4 (2007). For an express contract to bar an unjust enrichment claim, however, the express contract must be "*between the same parties* on the same subject matter." *Morris Pumps v. Center Line Piping*, 273 Mich. App. 187, 194-95, 729 N.W.2d 898, 903 (2006) (quoting 42 CJS, Implied and Constructive Contracts, § 34, p. 33). The express contract in this case is between FPCY and Howell while the unjust enrichment claim is brought against Boles and Schmitt. Accordingly, there is "no reason why [FPCY] should not be allowed to simultaneously and alternatively assert a contract claim against one defendant with whom an express contract exists and a quantum meruit claim against [] *different* defendant[s] with whom no express contract[s] exist[]." *Id.* at 199-200, 729 N.W.2d at 906.

Next, Boles and Schmitt challenge the unjust enrichment claims on grounds that FPCY conferred no benefit on them. To succeed in its unjust enrichment claim, FPCY "must establish (1) the receipt of a benefit by the defendant[s] from the plaintiff and (2) an inequity resulting to the plaintiff because of the retention of the benefit by the defendant[s]." *Id.* at 195, 729 N.W.2d at 904. This requires that FPCY prove that Boles and Schmitt received funds paid by FPCY. Although FPCY has presented evidence to establish that Boles and Schmitt received repayments on their loans to Howell during the same time period that FPCY made payments to Howell, FPCY failed to present sufficient evidence to establish that the repayments received by Boles and Schmitt were the actual contract payments made by

20

FPCY. And even assuming some of the repayments consisted of funds from FPCY,[8] the inability to trace funds flowing in and out of Howell would make it impossible for this Court to determine the extent of personal liability for the individual defendants.

For these reasons, this case is distinguishable from cases where the unjust enrichment came in the form of construction materials or services that were unquestionably applied to the benefit of third parties. *See Morris Pumps*, 273 Mich. App. 187, 729 N.W.2d 898 (2006); *Krammer Asphalt Paving Co., Inc. v. E. China Twp. Schools*, 443 Mich. 176, 504 N.W.2d 635 (1993). Lacking evidence that Boles and Schmitt were unjustly enriched by the payments made by FPCY, Boles and Schmitt are entitled to summary judgment.

## IX. Conclusion

Even viewing the record evidence in this case in the light most favorable to FPCY, FPCY's claims for pre-contract fraud and unjust enrichment fail as a matter of law. At the same time, however, there remain genuine issues of material fact as to whether Boles engaged in post-contract fraud and whether RKO can be held liable for any of the claims alleged in this case as a successor corporation to Howell.

Accordingly,

---

[8]FPCY itself has proven that the repayments made to Boles and Schmitt could not have been exclusively derived from FPCY contract payments; the total amount of repayments to Boles and Schmitt during the relevant period exceeds the amount of contract payments made by FPCY. It is also notable that, during the relevant period, Boles and Schmitt continued providing loans to Howell, making it possible that some of the repayments came from Boles and Schmitt themselves.

**IT IS ORDERED** that the Motion for Summary Judgment filed by defendants Boles and Howell is **GRANTED IN PART** as to counts I, V, and VI and **DENIED IN PART** as to counts II and III.[9]

**IT IS FURTHER ORDERED** that the Motion for Summary Judgment filed by defendant Schmitt is **GRANTED** and that defendant Schmitt is dismissed from the case.

**IT IS FURTHER ORDERED** that the Motion for Summary Judgement filed by defendant RKO is **DENIED**.

s/PATRICK J. DUGGAN
UNITED STATES DISTRICT JUDGE

Copies to:
Gary W. Faria, Esq.
Jennifer Boueri Chilson, Esq.
Thomas M. Schehr, Esq.
Eric D. Scheible, Esq.
Barbara J. Sullivan, Esq.

---

[9]As previously noted, Howell does not seek summary judgment as to count IV.

22